**PAPER SYSTEMS INCORPORATED,**
Plaintiff,

v.

**MITSUBISHI CORPORATION,** Mitsubishi International Corporation, Mitsubishi Paper Mills Ltd., Elof Hansson Paper & Board, Inc., Kanzaki Specialty Papers, New Oji Paper Co., Ltd., and Nippon Paper Industries Co., Ltd., Defendants.

Graphic Controls Corp., Plaintiff,

v.

Mitsubishi Corporation, Mitsubishi International Corporation, Mitsubishi Paper Mills Ltd., Appleton Papers, Inc., Elof Hansson Paper & Board, Inc., Kanzaki Specialty Papers, Oji Paper Co., Ltd., and Nippon Paper Industries Co., Ltd., Defendants.

Victor Paper Roll Products,
Inc., Plaintiff,

v.

Mitsubishi Corporation, Mitsubishi International Corporation, Mitsubishi Paper Mills Ltd., Appleton Papers, Inc., Elof Hansson Paper & Board, Inc., Kanzaki Specialty Papers, New Oji Paper Co., Ltd., and Nippon Paper Industries Co., Ltd., Defendants.

Nos. 96–C–959, 97–C–412, 97–C–508.

United States District Court,
E.D. Wisconsin.

May 5, 2000.

Beth J. Kushner, von Briesen, Purtell & Roper, Milwaukee, Daniel A. Small, Cohen, Milstein, Hausfeld & Toll, Washington, DC, Howard J. Sedran, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, Arthur N. Bailey, Arthur N. Bailey and Associates, Jamestown, NY, for Paper Systems Incorporated.

Robert B. Corris, Robert B. Corris, S.C., Milwaukee, WI, for Victor Paper Roll Products.

Robert L. Gegios, Attorney Beth J. Kushner, von Briesen, Purtell & Roper, Milwaukee, Attorney Michael D. Hausfeld, Daniel A. Small, Victoria C. Arthaud, Cohen, Milstein,

Hausfeld & Toll, Washington, D.C., Arthur N. Bailey, Arthur N. Bailey & Associates, Jamestown, NY, Howard J. Sedran, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, for Graphic Controls Corp.

Thomas M. Pyper, Whyte, Hirschboeck & Dudek, Madison, Laurence Sorkin, Cahill, Gordin & Reindel, New York City, for Mitsubishi Corp./Mistubishi Int'l Corp.

Jeffrey W. Kilduff, Richard G. Parker, O'Melveny & Myers, Washington, DC, David J. Cannon, Michael, Best & Friedrich, Milwaukee, for Defendant Nippon Paper Industries Co., Ltd.

Richard E. Donovan, Attorney Mark S. Gregory, Kelley, Drye & Warren, New York City, Howard A. Pollack, Godfrey & Kahn, Milwaukee, for Kanzaki Specialty Papers, Inc. and New Oji Paper Co., Ltd.

Jerold S. Solovy, Jenner & Block, Chicago, IL, Brian R. Smigelski, Friebert, Finerty & St. John, Milwaukee, WI, for Mitsubishi Paper Mills, Ltd.

Stanley M. Lipnick, Arnstein & Lehr, Chicago, IL, Frank W. Doster, Arnstein & Lehr, Milwaukee, WI, for Elof Hansson Paper & Board, Inc.

Glenn S. Leon, Simpson, Thacher & Bartlett, New York City, Thomas E. Brown, Kathryn Keppel, Gimbel, Reilly, Guerin and Brown, Milwaukee, WI, for Appleton Papers, Inc.

### DECISION AND ORDER

ADELMAN, District Judge.

In these three consolidated antitrust actions, plaintiffs contend that sellers of heat-sensitive facsimile paper conspired to fix prices from February 1990 through March 1992, in violation of the Sherman Act, 15 U.S.C. § 1. Suit is brought under § 4 of the Clayton Act, 15 U.S.C. § 15. Plaintiffs seek to bring the suit as a class action under Rule 23 of the Federal Rules of Civil Procedure. Currently before me is plaintiffs' motion to certify a proposed class.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At the time these complaints were filed in 1996, thermal facsimile paper was a $120 million per year industry in the United States. Thermal facsimile paper is covered with a chemical coating that produces an image when heat is transferred from a print head. The paper is manufactured in "jumbo rolls" weighing up to 2,000 pounds. The jumbo rolls are then sold by manufacturers and distributors to converters. The converters cut the jumbo rolls into smaller rolls that are then sold to the retail market. The end users are primarily small businesses and individuals owning inexpensive facsimile machines that do not use plain paper, as well as users of certain medical printing and other equipment. Plaintiffs and members of the proposed class are converters. (Paper Sys. Compl. ¶¶ 24–25.) Defendants include both thermal facsimile manufacturers and distributors. Plaintiffs allege that both the manufacturers and distributors participated in the price-fixing conspiracy. Previously the Department of Justice prosecuted defendants in this case for violation of the antitrust laws for some of the conduct alleged here. According to defendant Appleton Papers, several other defendants pled guilty, but it was acquitted.

The case was randomly assigned to Magistrate Judge Patricia J. Gorence but the parties did not consent to full magistrate judge jurisdiction. Pursuant to plaintiffs' motion, Magistrate Judge Gorence recommended that the proposed class be certified. Defendants objected to the recommendation. I now address the issue. The standard of review is de novo. *See* 28 U.S.C. § 636(b)(1)(C).

## II. ANALYSIS

It is often observed that "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978)) (internal quotation marks omitted). Nonetheless, the pre-

ferred procedure is for the district court to dispose of a motion for class certification before ruling on the merits of the case. *See Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 475 (7th Cir.1997). Discovery frequently is necessary to determine whether the class should be certified. *See Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir.1993).

■ Pursuant to Fed.R.Civ.P. 23, plaintiffs must satisfy all four subsections of Rule 23(a), and one subsection of Rule 23(b), here, Rule 23(b)(2). Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(b)(2) requires "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." I am required to conduct a rigorous analysis to ensure that the prerequisites of Rule 23 are satisfied. *See Falcon*, 457 U.S. at 161, 102 S.Ct. 2364.

The plaintiffs' modified proposed class is as follows:

> All individuals and entities who, during the period February 1, 1990 through March 31, 1992, purchased jumbo roll thermal facsimile paper in the United States directly from one or more of the defendants, but excluding from the class defendants, Honshu paper Co., Ltd., Japan Pulp & Paper Co., Ltd., Mitsui & Co., Ltd., Japan Pulp & Paper(U.S.A.) Corporation, Mitsui & Co. (U.S.A.) Inc. and Elof Hansson K.K.

(Pls.' Resp. to Ct.'s Request for Status of Mot'n for Prelim. Approval of Partial Settlement & Mot'ns for Relief from Scheduling Ord. & for Certification of Modified Class (1/14/98) at 4.) I will refer to the period from

February 1, 1990 to March 31, 1992 as "the class period."

## A. Rule 23(a)(1): Numerosity and Impracticability of Joinder

■ The number of members in the proposed class is an important but not the only focus of inquiry under Rule 23(a)(1); courts have certified very small classes, and declined to certify much larger classes. *Compare Manning v. Princeton Consumer Discount Co.*, 390 F.Supp. 320, 324 (E.D.Pa. 1975) (certifying class of 14 members) *with Minersville Coal Co. v. Anthracite Export Ass'n*, 55 F.R.D. 426, 428 (M.D.Pa.1971) (declining to certify class of 330 members). The Supreme Court has observed that potential claimants in antitrust actions will often be so numerous that joinder of all is impracticable and that a class action will therefore be necessary. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 739, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). A class with more than forty members is generally sufficiently numerous that joinder is considered impracticable. *See Chandler v. Southwest Jeep–Eagle*, 162 F.R.D. 302, 307 (N.D.Ill.1995); *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D.Cal.1988) ("As a general rule, classes of 20 are too small, classes of 20–40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough."). The proposed class in this case would consist of between 74 and 100 members, suggesting that, absent persuasive reasons to the contrary, joinder should be considered impracticable.

A second factor pointing towards certification arises when the potential class members do not reside in the same judicial district. *See Riordan v. Smith Barney*, 113 F.R.D. 60, 62 (N.D.Ill.1986) (finding that because the twenty-nine proposed class members resided in nine states, joinder was impracticable). In this case, the magistrate judge found that potential class members reside in twenty-two states. (R. 157 at 7.) Defendants have not contested this finding.

A third factor is the ability of class mem-

bers to press their own suits.[1]  *See Swanson v. American Consumer Indus., Inc.,* 415 F.2d 1326, 1333 n. 9 (7th Cir.1969) (holding that joinder of 40 proposed class members was impracticable where the individual class members were widely scattered and their holdings were generally too small to warrant undertaking individual actions).  It is true that the treble damages and attorney's fees available in an antitrust suit make joinder more feasible.  *See Christiana Mortgage Corp. v. Delaware Mortgage Bankers Ass'n,* 136 F.R.D. 372, 378 (D.Del.1991).  Nonetheless, the enhanced access to judicial relief provided by such remedies does not prevent finding an antitrust class sufficiently numerous that joinder is impracticable.  *See, e.g., Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (making no challenge to use of class tool in antitrust action of small-lot buyers against securities dealers); *Reiter v. Sonotone Corp.,* 442 U.S. 330, 344, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) (upholding class certification in antitrust action of hearing-aid consumers against manufacturers).

Defendants urge that potential class members are not small investors as in *Eisen,* or individual consumers as in *Reiter,* but million- or multi-million dollar corporations which are well able to bring suit on their own.  However, the presence of large claimants in a proposed antitrust class and the possibility that some of them might proceed on their own does not militate against class certification.  *See In re Folding Carton Antitrust Litig.,* 75 F.R.D. 727, 732 (N.D.Ill.1977).  Even where parties can afford to bring suit on their own, it is frequently economically unfeasible or imprudent for them to bring relatively small claims individually.  *See In re Fine Paper Antitrust Litig.,* 82 F.R.D. 143, 150 (E.D.Pa.1979).

Plaintiffs contend that fifty-three members of the proposed class each did less than a quarter-million dollars' business with defendants during the class period, and that the average overcharge during the class period was 8.76%. (Hartman Aff. 1/8/98 ¶ 13); (Decl. of Daniel A. Small in Supp. of Pls.' Reply Br. on Class Certification [hereinafter Decl. of Small], Ex. 1 ¶ 19.)  For these fifty-three class members, then, the largest expected claim will be approximately $22,000.  Given the complexities of antitrust litigation, it is not obvious that all members of the class could economically bring suits on their own.

A further consideration is that when courts have declined to certify classes on the ground that proposed class members could bring suit on their own, it is frequently because such proposed class members had actually initiated such suits or indicated that they planned to do so if certification was denied.  *See, e.g., Windham v. American Brands, Inc.,* 565 F.2d 59, 69 (4th Cir.1977) (en banc) (declining to certify class, in part because several plaintiffs testified categorically that regardless of whether the proposed class was certified, they were financially able to continue suit and intended to do so).  However, defendants have not identified any potential class members who have initiated suits or indicated that they plan to do so if certification is denied (other than the three named plaintiffs).  To be sure, defendants contend that this is because there is no merit to plaintiffs' claims.  But class certification does not rest upon the merits of plaintiffs' case, and in any event, the companies involved may reasonably believe that given the size of the losses involved, even antitrust treble damages are not sufficient to outweigh the cost in good will of suing their suppliers.  (As discussed below—and as defendants brought to the court's attention—one of the named plaintiffs, Paper Systems, caused its largest supplier, Appleton, to be dismissed from its suit because the two companies had a "strong relationship."  Other converters with smaller claims would be even more vulnerable to such economic considerations.)

In response to the magistrate judge's discussion (R. 157 at 11–14), the parties have also briefed the public policy question of whether and how the court should balance Congress's reliance on private enforcement

---

**1.** Although the ability of proposed class members to press their claims in the absence of certification does seem relevant to whether the class should be certified, this question appears conceptually independent of the heading under which it is traditionally considered, namely, whether joinder is practicable under Rule 23(a)(1).

of the antitrust laws, on the one hand, against the facts that, on the other hand, those same laws provide treble damages as an incentive for private actions, and that, in this case, the Department of Justice has already brought a public enforcement action against these defendants, concerning some of the conduct charged in these consolidated private actions. In the face of the more traditional considerations discussed above—there are far more than forty members of the proposed class, they are geographically dispersed over twenty-two states, roughly fifty potential claimants have claims worth at most $22,000, and all potential claimants presumably have incentives not to sue their suppliers—I believe that the class is sufficiently numerous that joinder is impracticable, regardless of whether as a general matter public policy favors or disfavors private antitrust class actions in cases in which the government has already prosecuted certain aspects of the charged conduct.

## B. Rule 23(a)(3): Typicality of Claims

■ Under Rule 23(a)(3), the claims of the representative parties must be typical of the class. "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Retired Chicago Police Ass'n,* 7 F.3d at 597 (quoting *De La Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983)). The named plaintiffs' claims here—that they paid illegal overcharges due to defendants' alleged antitrust violations—are identical to the claims of the proposed class members, and thus satisfy the typicality requirement.

## C. Rule 23(a)(4): Adequacy of Representation

■ Rule 23(a)(4) requires that the named plaintiffs be able adequately to represent the proposed class. Adequacy has two parts, namely, the adequacy of the named plaintiffs'

counsel, and the adequacy of representation in protecting the different, separate, and distinct interests of the class members. *See id.* at 598 (quoting *Secretary of Labor v. Fitzsimmons,* 805 F.2d 682, 697 (7th Cir.1986)). Plaintiffs' counsel have documented their experience in class actions, and defendants raise no objections to counsel's qualifications. Objections raised as to the capacity of each of the three named plaintiffs to represent the proposed class are discussed below.

Rule 23(a)(4)'s adequacy of representation requirement has been construed as also requiring that the representative plaintiffs and other class members must not have antagonistic or conflicting interests or claims. *See id.* (quoting *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992)). Defendants here contend that the named plaintiffs' interests are antagonistic to those of some members of their proposed class, on the ground that plaintiffs' depositions explored whether some converters relayed distributors' or manufacturers' price information from one distributor or manufacturer to another.[2] Defendants accordingly contend that plaintiffs' theory is that some members of the proposed class of plaintiff converters actually participated in the alleged price-fixing conspiracy. On that basis, they assert, the proposed class is comprised of two distinct groups—those who participated in the conspiracy and those who did not—and the named plaintiffs' claims cannot logically be typical of both alleged victims and alleged victimizers. (Appleton Papers Inc.'s Appeal from Order Granting Mot. to Strike and Objections to Magistrate Judge's Recommendation to Grant Mot. for Certification of a Modified Class at 8; Defs.' Joint Mem. of Law in Opp'n to Pls.' Mot. for Class Certification at 26–27.)

On my analysis, the asserted antagonism among proposed class members is too tenuous to deny certification. Plaintiffs themselves have not advanced the theory which defendants seek to ascribe to them. It ap-

---

**2.** The questions on which defendants base this argument asked defendants whether they gave particular named proposed class members price information, or revealed plans for an imminent price change, with the expectation that the information would find its way to a competing defendant, or whether they received information about competitors' prices from their customers. (Defs.' J.A. in Opp'n to Pls.' Mot'n for Class Certification [hereinafter Defs.' J.A.], Ex. 13 at 91; Ex. 14 at 45–50; Ex. 15 at 108–10; Ex. 16 at 53–54).

pears that the deposition questions to which defendants object are just as compatible with a theory that defendants used their customers as pawns to circulate price information that would be risky for them to disseminate directly to one another. Even if defendants did rely upon their customers to pass on this sensitive information, it appears that the customers' doing so would be just as consistent with their seeking to negotiate the best deals possible as with their deliberately participating in the alleged price-fixing conspiracy. Although some courts have denied certification based upon "a realistic possibility of antagonism, without more," *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 485–86 (5th Cir.1982) (per curiam), the antagonism postulated here appears to me more speculative than realistic. This is in contrast to *Chicago Retired Police Association*, where plaintiffs sought to contest the settlement of a different action but proposed a class which included parties both hurt by and benefitted by the contested settlement. *See Chicago Retired Police Ass'n*, 7 F.3d at 598. In *Horton*, the district court denied certification because of the likelihood that some parents and students in the proposed class might support the drug-sniffing dog program that plaintiffs opposed, but the Fifth Circuit Court of Appeals reversed, on the ground that dissenting class members were energetically and forcefully represented by the defendant school district. *See Horton*, 690 F.2d at 487. The Fifth Circuit rightly cautioned that a class opponent could not always be relied upon to represent dissenting members of the class, *see id.*, but in this case, defendants' principal contentions—that there were no antitrust violations, and even if there were, no one was hurt by them—are precisely the claims that would be argued by any proposed class members which participated in the alleged price-fixing conspiracy. For these reasons, I do not find that the postulated antagonism among members of the proposed class is so great as to deny certification. This issue may, of course, be revisited later if stronger evidence comes to light.

**1.  Adequacy of Victor Paper Rolls**

■  Defendants contend that each of the three individual plaintiffs is unsuited to provide adequate representation to the class as a whole. Claimants vulnerable to unique defenses are not allowed to be representative plaintiffs, for fear that they might be "distracted by a relatively unique personal defense." *Koos v. First Nat'l Bank of Peoria*, 496 F.2d 1162, 1165 (7th Cir.1974). The presence of even an arguable defense peculiar to the named plaintiff may bring into question the adequacy of the named plaintiff's representation. *See J.H. Cohn & Co. v. American Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir.1980). Defendants contend that Victor Paper Rolls ("Victor") and Graphic Controls ("Graphic") are both subject to such defenses.

Against Victor, defendants urge that it arguably lacked capacity to sue. John Houston, a 50% owner, testified that the company dissolved in March 1993. (Defs.' J.A. Ex. 4 at 19.) Victor filed its suit four years after that date, on April 29, 1997.

Whether Victor had the capacity to bring suit when it did is determined by the laws under which it was organized, in this instance, New Jersey. *See* Fed.R.Civ.P. 17(b). Houston testified that the corporation filed dissolution papers in 1993 (Defs.' J.A. Ex. 4 at 182–83), one of the four occurrences identified by New Jersey law as giving rise to a dissolution. *See* N.J. Stat. § 14A:12–8 (2000). Nonetheless, no party has provided a copy of any dissolution papers, and the New Jersey Department of Treasury issued a certificate stating that Victor's registration was revoked December 14, 1996—three years later—for failure to pay annual reports, apparently pursuant to N.J. Stat. § 54:11–2. (Defs.' J.A. Ex. 17.) Thus, it appears that Victor's charter remained in force until it was revoked in December 1996.

■  Regardless of when Victor was dissolved, New Jersey law provides that, once dissolved, a corporation may collect its assets, do whatever is necessary to liquidate its business, and sue and be sued.[3] The statute

---

**3.**  The relevant statute provides that:

(1) Except as a court may otherwise direct, a dissolved corporation shall continue its cor-

has been interpreted as meaning that once a corporation has finished the process of winding up its affairs and distributing its assets, it no longer has the power to sue or be sued. *See Global Landfill Agreement Group v. 280 Dev. Corp.*, 992 F.Supp. 692, 695 (D.N.J. 1998). But where a corporation's charter was revoked for non-payment of taxes more than six months before it filed suit, it nonetheless had sufficient existence under New Jersey law to create diversity jurisdiction in a federal suit that it filed to collect on moneys owed. *See Dyotherm Corp. v. Turbo Mach. Co.*, 48 F.R.D. 380, 384 (E.D.Pa.1969). Once a company's charter is revoked, the dissolved corporation exists solely to prosecute and defend cases. *See Lancellotti v. Maryland Cas. Co.*, 260 N.J.Super. 579, 617 A.2d 296, 298 (1992).

■ In this case, Houston testified that Victor sold its equipment to its nearest competitor, apparently in 1993, but Houston denied that this was a sale of all the company's assets. (Defs.' J.A. Ex. 4 at 75.) The very fact of this lawsuit suggests that when New Jersey revoked Victor's charter in December 1996, the company's officers and directors believed that there were remaining assets to collect. The precondition for finding that a corporation cannot sue or be sued, the completion of its winding up its affairs and distributing its assets, was therefore unfulfilled. *See Global Landfill*, 992 F.Supp. at 695. Victor's filing this suit in April 1997, less than six months after its charter was revoked, indicates that it is seeking to collect its assets, as allowed by N.J. Stat. 14A:12–9(1)(a). It appears that under *Lancellotti* and *Dyotherm*, there is no arguable basis for defendants to contend that Victor lacked capacity to file this suit. To be sure, defendants may continue to press the point, but even so it does not appear that this issue will loom so large as to create a genuine worry that Victor and its counsel will be "distracted" from adequately representing the class. *Koos*, 496 F.2d at 1165.

Defendants further argue that Victor is unsuited to be a class representative because its principal, John Houston, stated at his deposition that he lacked personal knowledge of many assertions made in Victor's complaint, was unsure of his ability to "go to bat" for a class of converters, and late in the deposition estimated the size of the class at between three and five. Relevant testimony is set out in the margin.[4]

porate existence but shall carry on no business except for the purpose of winding up its affairs by
(a) collecting its assets;
. . . .
(d) doing all other acts required to liquidate its business and affairs.
(2) Subject to the provisions of subsection 14A:12–9(1), and except as otherwise provided by court order, the corporation, its officers, directors and shareholders shall continue to function in the same manner as if dissolution had not occurred. In particular, and without limiting the generality of the foregoing,
. . . .
(e) the corporation may sue and be sued in the corporate name and process may issue by and against the corporation in the same manner as if dissolution had not occurred.
N.J. Stat. § 14A: 12–9 (2000).

4.
Q: Why did you decide to file the lawsuit?
A: Well, it takes more than just one person, and it is a class suit and involved many, many other—I think many, many other converters. The more I thought about it [why Victor Paper failed], the more I couldn't

reason why. I keep going back to this, it was just no—I don't know. . . . I can't understand why I was not successful in that business.
Q: Who decided to file a federal lawsuit in Milwaukee?
A: My attorneys.
Q: If it goes to trial there, would you attend?
A: If I'm called on it.
Q: Would you attend day in and day out?
A: I would like to see what happened to my frame of mind that I blew it in 1992 and '93, '94. To this day it does not make sense why I couldn't make a go, and I will ride it out.
Q: So you will attend the trial?
A: If I have to.
Q: What do you mean?
A: If I'm asked to.
Q: By whom?
A: By counsel.
Q: But if it's your decision, would you attend the entire trial?
A: If it would help the total picture, yes.
. . . .
Q: As somebody out front with your name on the front of the complaint here, as a class representative of converters, generally, does Victor Paper seek to represent all converters

The courts have held that a representative plaintiff must be conscientious. *See Rand v. Monsanto Co.*, 926 F.2d 596, 599 (7th Cir.1991). However, there is no requirement that the representative plaintiff be knowledgeable of either the allegations or the legal theories on which the lawsuit rests. In *Surowitz v. Hilton Hotels, Inc.*, 383 U.S. 363, 366, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966), the Supreme Court found a representative plaintiff in a securities class action unproblematic, even though her deposition showed that she did not understand the complaint at all, was unable to explain the statements made in the complaint, had a very small degree of knowledge as to what the lawsuit was about, and was ignorant not only of the defendants' names but also of the nature of their alleged misconduct. Other courts have made similar rulings in antitrust cases. *See, e.g., In re Catfish Anitrust Litig.*, 826 F.Supp. 1019, 1037 (N.D.Miss.1993) ("An antitrust litigant is not expected to appreciate the finer points of the Sherman Act, Clayton Act, or the Federal Rules of Civil Procedure governing class action certification."); *Lewis v. National Football League*, 146 F.R.D. 5, 10 (D.D.C.1992) (holding that Rule 23(a)(4) has no requirement that representative plaintiffs in antitrust class action actively read the briefs, participate in the lawsuit on a daily basis, or have extensive knowledge of their case). *But see Kassover v. Computer Depot, Inc.*, 691 F.Supp. 1205, 1213–14 (D.Minn.1987) (rejecting securities class action representative plaintiff on ground he was unfamiliar with several critical aspects of the litigation; admitted that he possessed "no facts" to support the complaint's essential allegations; and rather than competently controlling the course of the litigation, relied entirely upon his attorney's direction, thereby abdicating his own responsibility).

In this case, Houston demonstrated that he is aware of the essential aspects of the litigation and knows that he represents a class of other converters in a price-fixing action. His conceding a lack of personal knowledge of defendants' antitrust violations

who bought jumbo roll thermal paper in February '92, '93?

A: I don't think I can represent all. I would be a part of whatever my attorneys tell me I should be doing.

Q: Coming into the business in the middle of the period and starting Victor Paper as you did, would you say you were just like all the other converters in the business?

A: No. I think most of those fellows were way ahead of me with what they know about the industry, experience, expertise. I learned quick. I did learn quick.

. . . .

Q: So, do you think you can go to bat for them [other converters] in this lawsuit and do a fair job of it?

A: No.

Q: Why not?

A: I don't know enough about the technical side of their products.

Q: How did you go about retaining counsel after that initial call to Mr. Peoples?

. . . .

A: I called him.

. . . .

Q: Take a look at paragraph 19 [of the complaint], please. Is that your estimate that there are more than 50 converters who directly bought thermal paper from the defendants during the relevant time period?

A: Yeah.

Q: What's your basis for that?

A: A converter could be more than just a paper roll converter. Every form of manufacturer in this country is cutting thermal rolls down besides us.

. . . .

Q: You have no evidence that the defendants conspired to restrain trade or fix prices, do you?

A: No, I don't.

Q: Or that Appleton participated in any such conspiracy?

A: No, I don't.

. . . .

Q: Do you have any evidence or knowledge regarding conversations, telephone conversations, meetings or discussions among the defendants?

A: No.

. . . .

Q: And as you sit here today, you don't know how many there are today?

A: Not without reading slips here.

Q: You are aware you brought a lawsuit that purports to be a class action?

A: Correct.

Q: And the class that you seek to represent consists of what?

A: Many other converters.

Q: Do you know approximately how many converters are in the class?

A: To be honest, no, I don't.

Q: No idea. I don't want you to guess. If you can estimate, you can do that, but don't guess.

A: Three or four, five.

(Decl. of Small. Ex. 46 at 184, 189; Defs.' J.A. Ex. 4 at 185–86, 188, 300.)

appears to bespeak his credibility; it is rare for a victim to be at the table when antitrust conspiracies are hatched and agreed upon, and discovery will provide the opportunity to determine whether there is evidence to support the good-faith allegations made in the complaint. I find Houston's confusion about whether the class had 5 or 50 members, and his statement that he could not do a good job representing the class because he was unfamiliar with the technical side of other converters' products, irrelevant. Victor has in no way shown that it has abdicated its responsibilities.

■ A further argument that defendants raise against Victor's adequacy as a class representative is that it purchased thermal facsimile paper from defendants for only part of the class period. However, an antitrust class representative need only be fairly covered by the class definition; there is no requirement that it have purchased from defendants throughout the entire class period. *See, e.g., In re Art Materials Antitrust Litig.,* 1983 WL 1802, *3 (N.D.Ohio Apr.1, 1983).

### 2. Adequacy of Graphic Controls

■ Graphic appears to have sold its interests in the thermal facsimile paper business to another converter, Miami Systems Corporation, in April 1995. The sale and purchase agreement included "all rights or choses in action arising out of occurrences of the Business." (Defs.' J.A. Ex. 18 at GCC1236.) On that basis, defendants contend that Graphic has no claim to bring, and is thus incapable of being a class representative. Plaintiffs have supplied a copy of an assignment by Miami Systems to Graphic, reciting that the parties did not intend to transfer the antitrust claims asserted in the present case and assigning them to Graphic. (Donald E. Haviland Aff. of 12/22/98.) Rights to an antitrust action may legally be transferred. *See Moore v. Backus,* 78 F.2d 571, 576 (7th Cir.1935). I am satisfied that Graphic will not be so distracted by showing that it has the right to press its claims that there is any genuine worry that it would not vigorously represent the class.

### 3. Adequacy of Paper Systems

Two challenges have been raised to Paper Systems' adequacy as a representative plaintiff. First, the deposition of Paper Systems' president revealed that he did not know the definition of the proposed class, how many members it had, whether it had been certified, who plaintiffs' counsel was, what the case's procedural status was, or whether it was pending in federal or state court. But the president was quite aware of what a class action was, that this action was a proposed class action, that Paper Systems would be representing a class of other converters, and that the dispute was over allegations of price-fixing for a specified period. In addition, the affidavit of Paper Systems' finance director indicates that he has coordinated the company's contacts with plaintiffs' counsel, is familiar with the issues in the case, and understands Paper Systems' duties as class representative. (Aff. of Donald E. Haviland Jr. in Supp. of Pls.' Supplemental Reply Brief on Class Certification, Ex. B.) Under the standards of *Surowitz,* there is no reason to deny certification.

Second, Paper Systems stipulated to dismissing Appleton as a defendant on September 24, 1996, thirty-four days after filing suit against it. (R. 7.) Appleton is nonetheless a defendant in these consolidated actions, because it was named as a defendant by both Graphic and Victor, which filed their suits in April 1997, more than six months after Paper Systems dismissed Appleton. The three suits were not consolidated until September 24, 1997. In his deposition, Paper Systems' president testified that Appleton was Paper Systems' principal vendor for jumbo rolls, and that he was upset to discover that Appleton had been named as a defendant. He ordered Appleton to be dismissed because "I had a good relationship with them, and I didn't see any reason to sue them or participate in a lawsuit [against them]." (Defs.' J.A. Ex. 19 at 161, 167.)

■ Class representatives owe fiduciary duties to the absent members of the class, and are entrusted with the responsibility to advance and protect their interests. *See Kline v. Wolf,* 88 F.R.D. 696, 700

(S.D.N.Y.1981); Manual for Complex Litigation, Third § 30 at 211 (1995).[5]

■ To be sure, antitrust plaintiffs need not sue all alleged antitrust conspirators, as they are jointly and severally liable. *See, e.g., William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1053 (9th Cir.1981). Some courts have found that class representatives' adequacy is not impeded by failure to join a potential defendant. Thus, in *Hurwitz v. R.B. Jones Corp.,* 76 F.R.D. 149, 165 (W.D.Mo.1977), plaintiffs sued a corporation's directors and officers under two claims: a derivative claim on behalf of the corporation itself; and a class action claim on behalf of all shareholders. The court held that plaintiffs' failure to name the corporation as a defendant in the shareholder class action claim did not constitute inadequate representation, because the director and officer defendants had sufficient assets to pay any judgment that might be rendered and any prejudice to class members was therefore more illusory than real. *See id.* And in *American Trading & Production Corp. v. Fischbach & Moore, Inc.,* 47 F.R.D. 155, 156 n. 2 (N.D.Ill.1969), the court rejected a challenge to the adequacy of class representatives based on their not suing a potential defendant, noting that under Illinois tort law a plaintiff need not sue all possible defendants. More generally, failure to join all defendants is a strategy choice, and except for a showing of unique circumstances, is probably not a ground for finding inadequacy. *See* 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 17.12 at 17–32 (3d ed.1992).

■ I believe that the circumstances involved here—Appleton's being named as a defendant and shortly thereafter being dismissed by a class representative for wholly self-interested reasons—render this case sufficiently unique that *Hurwitz* and *American Trading* do not apply. A fiduciary duty demands undivided loyalty and, in Judge Cardozo's memorable phrase, "the punctilio of an honor the most sensitive." *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 546 (1928). Paper Systems filed a class action complaint on August 21, 1996, and thereby voluntarily assumed a duty to provide vigorous representation of the interests of all members of its proposed class. Thirty-four days later, Paper Systems caused its largest supplier to be dismissed as a defendant at the behest of Paper Systems' president, on the ground that he had "a good relationship with them." While such considerations are appropriate when a party represents only itself and accordingly should act solely from self-interest, they are wholly inappropriate for a class representative which, by definition, owes undivided loyalty to other, absent, parties. Paper Systems' conduct in dismissing Appleton can in no way be considered a strategic decision on behalf of the class members it purported to represent. Paper Systems' actions appear to betray a conflict of interest between named parties and the class they seek to represent *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (citing *Falcon,* 457 U.S. at 157–58 n. 13, 102 S.Ct. 2364).

It is true that Graphic and Victor both named Appleton as a defendant, and there-

---

5. I observe in addition that Paper Systems' president signed the verification to Paper Systems' answers to mandatory interrogatories under penalties of perjury (including a statement that he had read the answers and that they were true and correct to the best of his knowledge, information and belief), but testified that he had in fact "probably not" read the document and instead "probably thumbed through it real quick, *if it was there.*" (Defs.' J.A. Ex. 19 at 186) (emphasis added). He had no recollection of whether the answers had been there when he signed, or only the signature page, and testified in any event that he had done nothing to verify that the information was accurate. (*Id.* at 186, 187–88.) (To be sure, Paper Systems' finance director later stated under penalties of perjury that he checked the accuracy of the answers before they were submitted to the company president to sign under penalties of perjury, but in that case the finance director and not the president should have verified the answers' accuracy.) A cavalier attitude towards verified court documents appears to reflect less than a diligent effort to advance and protect the interests of absent class members. A class representative is required to comply wholeheartedly with discovery obligations. *See Norman v. Arcs Equities Corp.,* 72 F.R.D. 502, 506 (S.D.N.Y.1976) ("One who will not comply wholeheartedly and fully with the discovery requirements of modern federal practice, is not to be regarded by this Court as one to whom the important fiduciary obligation of acting as a class representative should be entrusted.").

fore that class members will still be able to recover against Appleton. (But recall that Graphic and Victor's suits were not filed until six months after Paper Systems dismissed Appleton, and the cases were not consolidated for another six months.) It is also true that even if Graphic and Victor had not sued Appleton, class members would nonetheless be likely to be able to recover from Appleton's asserted co-conspirators any damages due to Appleton's alleged role, through joint and several liability. Nonetheless, evaluating whether a fiduciary has fulfilled the duties it owes its principals demands a higher standard than "no harm, no foul." The only consideration that entered into Paper Systems' decision to dismiss Appleton—at a time when it had put itself forward as the only representative plaintiff—was its president's assessment that the two companies had a good relationship. This cannot be squared with undivided loyalty to absent class members. Because Paper Systems has proven itself an inadequate class representative, it will henceforward simply be a member of the class (although, of course, it retains the right to exclude itself under Fed. R.Civ.P. 23(c)(2)).

### D. Rules 23(a)(2) and 23(b)(3): Common Questions and Predominance

In antitrust class actions, courts frequently analyze together whether there are common questions of fact or law under Rule 23(a)(2) and whether common questions predominate over other issues under Rule 23(b)(3). *See* 4 Newberg & Conte § 18.26.

The substantive law under which plaintiffs press their claims is § 4 of the Clayton Act, 15 U.S.C. § 15. Recovery in such a private price-fixing claim requires establishing: (1) proof of antitrust violations, that is, that defendants illegally conspired;

(2) proof of causation, that is, that the alleged antitrust violations caused plaintiffs to suffer some injury; and (3) proof of damages due to the violations. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 113, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *In re Indus. Gas Antitrust Litig.*, 100 F.R.D. 280, 288 (N.D.Ill.1983).

### 1. Antitrust Violations

Rule 23(a)(2)'s commonality requirements may not be presumed merely because of the inherent nature of the case. *See Falcon,* 457 U.S. at 157, 102 S.Ct. 2364. Nonetheless, the first allegation in a price-fixing case, that there were antitrust violations, is generally sufficient to satisfy the commonality requirement of Rule 23(a)(2). *See Jackshaw Pontiac, Inc. v. Cleveland Press Publ'g Co.*, 102 F.R.D. 183, 189 (N.D.Ohio 1984). In this case, plaintiffs allege that defendants held meetings to fix prices,[6] as well as make other allegations whose proof would be the same for all members of a class. I find that these allegations satisfy Rule 23(a)(2)'s requirement of a question of law or fact common to all members of the class.

### 2. Fact of Injury and Amount of Damages

Defendants urge that no common proof of injury and damages will be possible; individualized evidence will be required instead. Customers who can show that they paid uniform prices—for example, due to manufacturers' list prices—can generally show common proof of injury, and there were price lists in this case. Nonetheless, it appears, as defendants contend, that these price lists were rarely enforced; to the contrary, it appears that plaintiffs and members of the proposed class used the price lists to bargain for better rates.[7] The price charged in each

---

**6.** Included in plaintiffs' evidence of antitrust violations are such items as minutes from a February 6, 1990 meeting entitled, "Meeting of Four Thermal Paper Companies" whose third item is "Disclose price levels for each market, and try to put a stop to price decreases. Prepare the foundation for launching price increases later on.... If possible, 10% up from April production." (Decl. of Small, Ex. 15 at 014–0369.)

**7.** Indeed, it appears that during the class period, thermal facsimile paper prices continued a downward trend that began before the class period, due in part to the increasing popularity of recently-introduced plain paper facsimile machines. (Defs.' J.A., Ex. 5 ¶ 3 n. 2.) Defendants take the fact of declining prices to establish that competition was alive and well during the class period and that as a result any antitrust agree-

sale, defendants allege, was set by an individualized bargain between buyer and seller. (Lillge Aff. ¶ 4.) Moreover, for at least one of the facsimile paper manufacturing defendants, Appleton, several factors affected the prices set in those individualized contracts. Many customers entered into price protection agreements with Appleton, which capped the customer's maximum price for a specified period. Volume incentive pricing gave rebates or lower prices to customers for purchasing specified volumes of facsimile paper, (*id.* ¶ 5), and larger customers were able to command further price concessions, (*id.* ¶ 7). For such reasons, defendants contend, even if plaintiffs could prove antitrust violations, plaintiffs' proof of injury would necessarily require determining whether each of thousands of different sales over the class period was affected by the conspiracy.

Moreover, defendants contend, thermal facsimile paper is a non-fungible product; there were three standard grades during the class period, and the quality of paper within each grade varied from maker to maker. (Lillge Aff. ¶ 2; Defs.' J.A., Ex. 24 at 1679.) For that reason, defendants urge, plaintiffs' proof of damages would be difficult to establish at best, and in any case would require a highly individualized inquiry into each plaintiff's and each class member's individual purchases during the class period. In sum, defendants contend, "computation of damages would be a complex, highly individualized task, imposing an intolerable burden on the judicial system." *Butt v. Allegheny Pepsi–Cola Bottling Co.*, 116 F.R.D. 486, 492 (E.D.Va.1987).

Defendants rely on the leading cases of *Windham v. American Brands, Inc.*, 565 F.2d 59, and *Alabama v. Blue Bird Body Co.*, 573 F.2d 309 (5th Cir.1978). In *Windham*, plaintiff tobacco growers alleged that defendant buyers conspired to depress flue-cured tobacco prices at auction by rigging their bids. The prices at auction varied from day to day; from market to market (there were some 36 warehouses in 11 geographic markets); and from grade to grade (government inspectors classified the tobacco into 161 grades, and each buyer used his own system,

generally with as few as 10 or as many as 32 grades). Further, plaintiffs alleged three different theories of conspiracy, and there was some reason to believe that some alleged illegal agreements affected only one market while others affected many or all. In addition, it was estimated that upwards of 20,000 parties would have to be given notice if plaintiffs' proposed class were certified. For these reasons, the Fourth Circuit, sitting en banc, upheld the district court's finding that proof of injury and damages would not lend itself to mathematical or formula calculation, but would rather require separate "mini-trials" of an overwhelmingly large number of individual claims. As a result, the court found, common issues did not predominate. *See Windham*, 565 F.2d at 68–70. The mere fact that plaintiffs declared that they expected at some later point in the litigation to develop a formula which would simplify the computation of individual damages was not enough to overcome the serious problems that had already appeared, the court ruled; those issues needed to be resolved before a class was certified, even if certification was conditional. *See id.* at 70.

In *Blue Bird*, plaintiffs alleged that makers of school-bus bodies conspired to rig bids to supply buses to governmental units in every state. The district court found that the fifty states had varying and comprehensive school bus specifications, and that many local governmental purchasers had additional or more stringent specifications; that significant variations resulted from the individual needs of various purchasers (for example, climate affected whether air conditioning was needed and how powerful a heater; the terrain to be traveled influenced engine size; special equipment was required to accommodate the handicapped); and that different public entities had substantially different purchasing practices. For these reasons, the court of appeals found that proof of injury and damages could be established only by examining the relevant school bus market where each individual plaintiff was located. Moreover, if the class were certified, thousands of claimants would be added, and because not all school buses were of similar

ments did not lead to injuries during the class period. (Defs.' J.A., Ex. 20 ¶ 8.)

quality or were marketed and purchased in a similar manner, a multitude of mini-trials would be required. *See Blue Bird,* 573 F.2d at 328. For these reasons and based on the record available on appeal, the court concluded that certification was improper under Rule 23(b)(3). *See id.*

Antitrust damages in price-fixing cases are historically assessed based upon estimates of overcharges due to the antitrust violations. *See Chattanooga Foundry & Pipe Works v. City of Atlanta,* 203 U.S. 390, 396, 27 S.Ct. 65, 51 L.Ed. 241 (1906) (affirming damages award based on "the difference between the price paid and the market or fair price that the city would have had to pay under natural conditions had the combination been out of the way"). Because the antitrust combination influenced the market, of course, there is rarely a direct method of assessing the price difference. This gives rise to the problem of how damages are to be estimated.

Plaintiffs propose to prove impact and damages for themselves and for members of the proposed class through their expert witness, economist Raymond S. Hartman. Dr. Hartman has prepared multiple regression analyses based upon 7,950 invoices for sales of the three primary grades of thermal facsimile paper before, during, and after the class period, from defendants to approximately 100 customers. (Decl. of Small, Ex. 52 ¶ 15 & attachment C.) (Dr. Hartman's analysis excluded transactions between defendants, *id.* ¶ 15, presumably because defendants are alleged conspirators.) The 7,950 invoices included in the analysis total roughly three-quarters of defendants' sales during the time periods studied. (*Id.* ¶ 16.) Dr. Hartman's economic analysis includes as variables the three grades of facsimile paper and each defendant's volume discounts and rebates,[8] and he asserts that his model controls for differing qualities of paper. (*Id.* ¶ 14.) Based upon his analysis comparing prices charged during the class period with prices before and after the class period, and controlling for differing grades, qualities, volume discounts and rebates, Dr. Hartman initially

concluded that during the class period prices were 9.46% higher than any known factors could account for, (*id.* ¶ 17), and revised the figure to 8.76% in a rebuttal report (Decl. of Small, Ex. 1 ¶ 19). The model allows aggregate estimated damages to be allocated to individual customers. (*Id.* ¶ 25.) Dr. Hartman determines that the model is robust and can be used to estimate the amount of damages due to each defendant with adequate reliability. (Decl. of Small, Ex. 52 ¶ 17.) Dr. Hartman and plaintiffs attribute these higher prices to defendants' alleged antitrust violations.

Defendants' expert, economist B. Douglas Bernheim, contests many aspects of Dr. Hartman's methodology and analysis, and concludes that prices during the class period were 6.5% *lower* during the class period than Dr. Bernheim's competing econometric model predicted. (Defs.' J.A., Ex. 20 ¶ 13.) Dr. Hartman replies in his rebuttal report that Dr. Bernheim himself has made many theoretical and economic errors. (Decl. of Small, Ex. 1 ¶ 2.)

As mentioned above, motions to certify a class are frequently intermingled with the legal issues at the heart of the plaintiff's case. *See Falcon,* 457 U.S. at 160, 102 S.Ct. 2364. Nonetheless, resolving disputes about the merits of the plaintiff's case should be left to a later stage of litigation unless absolutely necessary to determining whether to certify the class. In this case, it appears that the disagreements over methodology and results between Dr. Bernheim and Dr. Hartman raise material disputed questions that will ultimately need to be resolved by the factfinder. *See In re Catfish Antitrust Litig.,* 826 F.Supp. at 1042 (citation omitted).

The only questions I must resolve now are whether, as defendants contend, plaintiffs' efforts to prove injury and damages with sufficient specificity will lead to individualized questions overwhelming common questions. Thus, for present purposes the only important issues arising from Hartman's analysis are his conclusions that his econometric model allows common proof of the fact of

---

8. Apparently one defendant, Kanzaki Specialty Papers, did not provide volume discount and

rebate information for 1993. (*Id.* at tbl. 1 n.c.)

antitrust overcharges and common proof of the amount of antitrust overcharges to be allocated among the defendants' various customers—the members of plaintiffs' proposed class. The fact of injury is a distinct question from the quantum of injury, and is often susceptible of common proof even if the amount of damages is uncertain or must be individualized. *See In re Screws Antitrust Litig.*, 91 F.R.D. 52, 56 (D.Mass.1981). No precise damage formula is needed at the certification stage of an antitrust action; the court's inquiry is limited to whether the proposed methods are so unsubstantial as to amount to no method at all. *See In re Potash Antitrust Litig.*, 159 F.R.D. 682, 697 (D.Minn.1995); *In re Indus. Gas Antitrust Litig.*, 100 F.R.D. at 306. Moreover, some courts have found that common questions predominated, based upon common proof of antitrust violations and the fact of injury, even though individualized questions predominated as to damages. *See In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268, 272 (D.Minn.1989).

Defendants argue that Dr. Hartman's methodology cannot provide a basis for assessing impact and damages on a classwide basis, but requires individualized inquiry for each class member. (Defs.' Joint Mem. of Law in Opp'n to Pls.' Mot'n for Class Certification [hereinafter Defs.' J. Mem.] at 22.) Specifically, defendants observe that Dr. Hartman concedes that according to his model, the amount of the antitrust overcharge varied from manufacturer to manufacturer and from customer to customer. Based upon *Windham* and *Blue Bird*, defendants argue that plaintiffs' proof of injury and damages would require the court to conduct intensive examinations of every member of the plaintiffs' class and every transaction alleged to be affected by the antitrust violations—examinations which would burden the court with disentangling a multitude of factors for each of dozens of class members and thousands of sales. (I observe some irony in the fact that the defendants here arguing that this court would be overly burdened by assessing injury and damages for the class members are the same defendants who urged that there are so comparatively few members of the proposed class that it would

not be impracticable under Rule 23(a)(1) to join them all into a single lawsuit.) The resulting inquiry into injury and damages would necessarily be individualized for each class member, defendants contend, and would overwhelm any common questions about the existence of antitrust violations.

Defendants' assessment is overly gloomy. Dr. Hartman's analysis, econometric regression, is the same used by defendants' expert, Dr. Bernheim, to evaluate the same question: whether prices in the industry during the class period were higher or lower than would be expected in the absence of otherwise unaccounted-for factors, such as a conspiracy. Regression analysis is a commonly accepted tool to make such assessments and to evaluate whether there is common impact from an alleged price-fixing conspiracy. *See, e.g., In re Potash Antitrust Litig.*, 159 F.R.D. at 698 (approving proposed use of econometric methods to calculate damages); *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 691–93 (N.D.Ga.1991) (finding economic regression analysis a valid statistical methodology for proving that each class member was, in fact, injured, and an adequate method to calculate individual damages); Section of Antitrust Law, American Bar Association, *Proving Antitrust Damages: Legal and Economic Issues* 145 (1996) ("Regression analysis is a statistical technique that, when appropriately used, can assist an antitrust plaintiff in proving both the fact and the amount of its injury."); Daniel L. Rubinfeld, *Econometrics in the Courtroom*, 85 Colum. L.Rev. 1048, 1087 (1985) (finding single equation multiple regression model provides the best, most accurate forecast of damages, including in price-fixing cases). Where courts have rejected the kind of economic model offered here, it has not been because they were invalid or overly speculative, but rather because their proponents had not gone beyond the stage of proposed methodologies, and moreover because the proposed methodologies did not control for several relevant variables, such as large volumes of sales at deviated prices, prompt payment discounts and other discounts which varied on a customer-by-customer basis. *See Dry Cleaning & Laundry*

*Inst. of Detroit, Inc. v. Flom's Corp.,* 1993 WL 527928, at *5–6 (E.D.Mich. Oct.19, 1993). As we have seen, though, Dr. Hartman's methodology controls for such factors, and far from being merely a proposed methodology, has been implemented and run, using many thousands of pieces of data provided during the discovery necessary for the certification stage. If accepted by the factfinder at the appropriate stage of litigation, the methodology promises to provide precisely the kind of single mathematical formula which can establish each class member's damages. *See Windham,* 565 F.2d at 70. For that reason, I find that common questions predominate over individual questions in the proof of antitrust violations, injury and damages.

### 3. Superiority

The final requirement under Rule 23(b)(3) is a showing that proceeding as a class action is superior to other methods of adjudication. Repeatedly litigating the same issues in individual suits, if certification were denied, would consume many more judicial resources than addressing them at a single blow in these consolidated actions. I believe that proceeding as a class action is the superior method.

**THEREFORE, IT IS HEREBY ORDERED** that plaintiff Paper Systems, Inc. shall no longer be a representative plaintiff in these consolidated actions;

**IT IS FURTHER ORDERED** that the magistrate judge's recommendation (R. 157) is **ADOPTED** and that plaintiffs' motion for certification of the modified class (R. 129, R. 234) is **GRANTED.**