**BROMINE ANTITRUST LITIGATION.**

Nos. IP 99–9310–C–B/S, MDL No. 1310.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Sept. 28, 2001.

Irwin B. Levin, Cohen & Malad, Indianapolis, IN, Mark Reinhardt, Reinhardt & Anderson, St. Paul, MN, for plaintiffs.

Michael J. Beck, Clerk of MDL Panel, Washington, DC, Edward W. Harris, III, Sommer & Barnard, Indianapolis, IN, Steven D. McCormick, Kirland & Ellis, Chicago, IL, Joseph A. Tate, Dechert Price & Rhoads, Philadelphia, PA, for defendants.

### ORDER CERTIFYING CLASS AND PRELIMINARILY APPROVING PARTIAL SETTLEMENT

BARKER, District Judge.

On January 14, 2000, the Judicial Panel on Multidistrict Litigation transferred to this court for coordinated or consolidated pretrial proceedings a number of antitrust actions against various bromine producers, including Great Lakes Chemical Corp. ("Great Lakes"), Dead Sea Bromine Company, Ltd. ("Dead Sea"), and Ameribrom, Inc. ("Ameribrom").[1] Named Plaintiffs, American Fire Retardant Corp. ("American Fire Retardant" or "AFR") and General Foam Corporation ("General Foam") ask the Court to certify a class consisting of all purchasers of certain bromine products from January 1, 1995 to April 30, 1998. In addition, Plaintiffs and the Dead Sea Defendants have reached a partial settlement agreement for which they seek the Court's preliminary approval. For the reasons set forth below, Plaintiffs' Amended Motion for Class Certification is *GRANTED*, and preliminary approval of the proposed partial settlement is *GRANTED*.

---

1. Ameribrom is the U.S. subsidiary of Dead Sea, an Israeli corporation with its principal place of business in Beer Sheva. "Dead Sea Defendants" refers to both Dead Sea and Ameribrom.

## I. Background Information and Procedural History

### A. An Introduction to Bromine and Its Uses

Bromine is a heavy, mobile, reddish-brown liquid that vaporizes readily into a red vapor. While bromine is widely distributed in nature, it is generally found in such low concentration that recovery is difficult. Most bromine for commercial purposes is recovered either from subterranean brines in Arkansas or from the Dead Sea in Israel. Brominated Diphenyl Oxides include decabromodiphenyl oxide ("DECA" or "decabrom"), octabromodiphenyl oxide ("OCTA" or "octabrom"), and pentabromodiphenyl oxide ("pentabrom"). These three compounds (and their blends), along with tetrabromobisphenol A ("TBBA" or "tetrabrom") (and its derivatives) are flame retardants. Methyl bromide products and their derivatives are used primarily as agricultural fumigants. As an ozone-depleting chemical, under the Clean Air Act and the Montreal Protocol, use of methyl bromide is being phased out.

### B. Bromine Industry Investigated and Civil Lawsuits Filed

On June 15, 1999, Defendant Great Lakes announced that it had been cooperating with the Antitrust Division of the U.S. Department of Justice ("DOJ") and the Directorate General for Competition of the European Commission in their investigation of the bromine industry.[2] Soon after, Plaintiffs filed a number of class action lawsuits alleging that the price of every elemental bromine product and every compound containing bromine sold in the United States was fixed at an artificially high level from April 1994 through June, 1999, in violation of Section 1 of the Sherman Act. In addition to suing Great Lakes and the Dead Sea Defendants, the Consolidated Amended Complaint also named Albemarle Corp. as a co-conspirator. More than one year later, on July 27, 2000, the Dead Sea Defendants plead guilty to a one-count Information filed in the United States District Court for the Northern District of Texas charging the Dead Sea Defendants "with participating in a conspiracy to suppress and eliminate competition in the United States by allocating customers and fixing the price to be charged to customers in the United States for certain brominated products sold by it between July, 1995 and April, 1998 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1." Plea Agreement, Tab 2, Appendix to Plaintiffs' Reply.

Following the filing of the lawsuit, the parties engaged in discovery and settlement negotiations. The Dead Sea Defendants filed a Motion to Dismiss, which they later withdrew. In October, 2000, Plaintiffs withdrew their original motion for class certification. The Amended Motion for Class Certification currently before the Court was filed in December, 2000. It narrowed the definition of products included in the conspiracy.[3] On March 29, 2001 Plaintiffs filed a lengthy motion, which they presented to the Court as uncontested. On April 2, 2001, the Court signed Plaintiffs' tendered order granting Plaintiffs leave to file a Second Consolidated Amended Complaint ("Complaint"), preliminarily approving Plaintiffs' settlement with Dead Sea and Ameribrom, certifying a class for settlement purposes, permitting notice to settlement class members, and setting a date for a fairness hearing. Great Lakes promptly asked the Court to reconsider its order, except to the extent Plaintiffs received leave to amend their complaint.

On September 6, 2001, we held a hearing so that the parties could argue these issues. At the start of the hearing, the Court vacated the April 2nd Order as to all parts, save leave to amend the complaint.[4] At the hear-

---

**2.** Defendant Great Lakes also announced its conditional acceptance into the DOJ Antitrust Division's corporate amnesty program.

**3.** Examples of products excluded from the amended class definition are brominated water treatment products, most commonly used to treat pools and spas, and oil completion fluids, used to lubricate equipment for drilling oil.

**4.** The Court noted its errors in granting preliminary approval of a class settlement without holding a hearing and in certifying a class for settlement purposes without formal findings of whether the class meets the requirements of Federal Rule of Civil Procedure 23. Vacating the earlier order presented the Court and the parties with the opportunity of a fresh start.

ing, the parties argued whether class certification is warranted and whether the proposed partial settlement is adequate. The Court appreciates the thorough briefing and oral argument on these issues. We weigh these arguments in our ruling below.

## II. Class Certification Requirements

The Court considers class certification from two perspectives. First, before us is Plaintiffs' Amended Motion for Class Certification. Also, Plaintiffs filed a motion seeking class certification for the purpose of settlement with the Dead Sea Defendants. The same criteria are used to analyze both motions. The class is defined similarly in both motions:

> All entities (excluding Defendants Dead Sea, Ameribrom and Great Lakes, subsidiaries and affiliates of Defendants and Defendants' co-conspirators) which purchased, or entered into a contract to purchase Brominated Diphenyl Oxides (decabromodiphenyl oxide, octabromodiphenyl oxide and pentabromodiphenyl oxide) and their blends, tetrabromobisphenol A ("tetrabrom") and its derivatives, and all methyl bromide products and their derivatives (hereinafter collectively referred to as "Brominated Products") in the United States directly from Defendants, their subsidiaries, affiliates and [5] their co-conspirators, between January 1, 1995 and April 30[sic] 1998.

Amended Motion for Class Certification at 1. Furthermore, whether for litigation or for

settlement, before certifying a class, the district court must find that the prerequisites for class certification set forth in Rule 23 are satisfied. *See Isaacs v. Sprint Corp.,* 261 F.3d 679, at 681–82 (7th Cir.2001) (criticizing district court for failing to analyze proposed class under Rule 23 prior to granting motion for class certification); *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 848–49, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) (requiring "heightened" Rule 23 analysis when district court certifies class for class action settlement only).

In both situations, certification is not a formality, and the court must carefully consider the argument against class certification. That class certification will not be scrutinized suitably is a risk normally inherent in certification for settlement purposes because no party opposes certification. Here, because the parties have fully briefed the motion for certification of a litigation class defined in the same manner as the proposed settlement class, we have the advantage of Great Lakes's full argument in opposition to class certification.[6] *Cf. In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litig.,* 55 F.3d 768, 787 (3d Cir. 1995) (lamenting fact that courts asked to certify settlement classes "perform[] their role as supervisor/protector without the benefit of full adversarial briefing on the certification issues.").

A class is appropriate for certification only if it meets the four prerequisites to a class action set out in Rule 23(a). These require-

---

The Court regrets whatever inconvenience and confusion our earlier actions may have caused.

5. In the Settlement Motion, ¶ (3), rather than "and," the definition uses the word "or." At the hearing, all parties averred that the definitions for the settlement and litigation classes are the same. For this reason, the Court concludes that the difference between the two versions is a typographical error.

6. We note that while Great Lakes's arguments are helpful, Great Lakes lacks formal standing to object to the proposed settlement and to class certification for settlement purposes (as opposed to class certification for litigation purposes, to which it clearly can object). In *Quad Graphics, Inc. v. Fass,* 724 F.2d 1230, 1233 (7th Cir.1983), the Seventh Circuit ruled that "a non-settling party must demonstrate plain legal prejudice in

order to have standing to challenge a partial settlement." The Seventh Circuit later applied this ruling to class actions. *Agretti v. ANR Freight System, Inc.,* 982 F.2d 242, 247 (7th Cir.1992) ("The doctrine of plain legal prejudice does not depend upon whether the settlement involves a class action or simply ordinary litigation."). Circumstances of plain legal prejudice include interfering with a party's contract rights or ability to seek contribution or indemnification or stripping a party of a legal claim or the right to present relevant evidence at trial. *Id.* (citations omitted). Great Lakes makes no argument that the proposed partial settlement would affect it in one of these ways, and perusal of the proposed partial settlement raises no concern that it would cause Great Lakes to suffer plain legal prejudice.

ments are numerosity, commonality, typicality, and adequacy of representation. Fed. R.Civ.P. 23(a). Once this hurdle is cleared, the court also must ensure that the proposed class satisfies one of the three standards established by Rule 23(b). Here, Plaintiffs argue that the class is maintainable under Rule 23(b)(3). Plaintiffs' Memo. at 12. Rule 23(b)(3) examines whether common questions of law or fact predominate over questions affecting individual members of the class and whether a class action is a superior method for resolving the controversy.

When deciding whether to certify a class, *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir.2001), controls the degree to which we examine the evidence submitted on the issue of class certification. In *Szabo*, the Seventh Circuit chastised the district court for accepting the allegations of the complaint as true when deciding whether to certify a class. 249 F.3d at 675 ("The proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it."). Instead, a district court must "make whatever factual and legal inquiries are necessary under Rule 23." *Id.* at 676. We must receive evidence and resolve disputes pertaining to class certification even when that means "mak[ing] a preliminary inquiry into the merits." *Id.* Keeping *Szabo* in mind, we begin by examining the four criteria identified in Rule 23(a).

## A. Requirements of Rule 23(a)

### 1. Numerosity

■ With regard to numerosity, the class must be so large that joinder of all parties would be impracticable. Fed.R.Civ.P. 23(a)(1). Plaintiffs estimate that the class includes more than 1,000 members residing in various states. Complaint, ¶ 23. Such a class would satisfy the numerosity requirement of Rule 23(a). *Hubler Chevrolet, Inc. v. General Motors Corp.*, 193 F.R.D. 574, 577 (S.D.Ind.2000) (certifying class numbering 200 members); *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 184 (N.D.Ill.1992) (approving class consisting of 129–300 geographically dispersed members). However, at the hearing, Great Lakes argued that,

once the bromine industry is broken down into what Great Lakes maintains are the proper markets, numerosity is lacking. For instance, Great Lakes argues that there are only 16 or 17 companies which purchase decabrom, a number too small to meet the numerosity requirement of Rule 23(a).

At the class certification stage of proceedings, the Court must reject this argument. First, Plaintiffs have alleged the existence of one conspiracy to raise and/or stabilize the price of all brominated products, as defined in the Complaint. Complaint, ¶¶ 28–32. As required by *Szabo*, 249 F.3d at 676, a "preliminary inquiry into the merits" of this allegation supports Plaintiffs' contention that the various brominated products, such as decabrom or methyl bromide, are not subject to separate conspiracies or part of different markets. For example, Plaintiffs point to a July 21, 1997 letter sent from Dave R. Bouchard, Vice President of Bromine & Bromine Derivatives of Great Lakes, to Samuel Hochman at Ameribrom. Tab 16, Appendix to Plaintiffs' Reply. This letter contains Bouchard's suggestion for the agenda of his upcoming meeting with Hochman. According to Bouchard's proposal, the two competitors planned to discuss "[l]ong term cooperation in various business pursuits." *Id.* The outline of the agenda then lists many of the brominated products listed in the amended class definition—methyl bromide, tetrabrom, octabrom, and decabrom. *Id.*

Whether the various products are exchanged in separate markets is a more complex question. As discussed in the introduction, diphenyl oxides and tetrabrom are flame retardants, suggesting that they are part of the same market. Great Lakes disputes this supposition on the basis of its expert's conclusions. As an example, Dr. William Wecker opines that decabrom and tetrabom have distinct customer bases and that their average quarterly prices did not move together during the proposed class period. 1st Wecker Aff., ¶¶ 9–10. Dr. John H. Kagel, Plaintiffs' expert, disagrees, stating "the factors that typically move prices up or down are fundamentally common across manufacturers and across commodity like brominated flame retardants and their asso-

ciated proprietary blends." 1st Kagel Aff., ¶ 16. No motions to strike Dr. Kagel's expert testimony for insufficiency under *Daubert* have been filed at this time. Hence, we accept his testimony in support of Plaintiffs' allegations for class certification purposes. *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, —— n. 3, 2001 WL 1025390, at *2 n. 3 (E.D.Pa. Sept. 4, 2001) ("To preclude such evidence at the class certification stage, it must be shown that the 'opinion is the kind of 'junk science' that a *Daubert* inquiry at this preliminary stage ought to screen.'" (citations omitted)). We agree with the conclusion of the Eastern District of Pennsylvania that "[t]o the extent that this discussion involves a battle of the experts, it is not appropriate for the Court to determine which expert is more credible at this time." *Id.*[7]

The same analysis applies to whether the market for methyl bromide is separate from that for brominated flame retardants. Dr. Wecker claims that the products are subject to different market forces. 1st Wecker Aff., ¶¶ 16–17. Dr. Kagel is equivocal on whether different "product segments" exist for flame retardants and the agricultural fumigant methyl bromide. 2nd Kagel Aff., ¶ 9. However, he also concludes that the impact from a price-fixing conspiracy involving both product segments would be common to all purchasers of brominated products. *Id.* That the supply, at least, of the two types of products would be subject to similar market forces is supported by the fact that methyl bromide is sometimes manufactured as a by-product of tetrabrom production. 1st Kagel Aff., ¶ 14. At this stage of the proceedings, we cannot conclude that purchasers of methyl bromide belong in a class separate from purchasers of flame retardants. Hence, numerosity does not suffer defeat on this ground.

### 2. Commonality

■ To maintain a class action, there must be questions of law or fact common to the class. Fed.R.Civ.P. 23(a)(2). The commonality requirement is ordinarily satisfied when there is "a common nucleus of operative facts." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir.1992). As this Court noted in *Hubler*, 193 F.R.D. at 577:

> Commonality does not require that all questions of fact or law be identical. *See Johns v. De Leonardis*, 145 F.R.D. 480, 483 (N.D.Ill.1992). Factual variation among class grievances does not defeat a finding of commonality. *See Rosario*, 963 F.2d at 1017. Rather, this requirement is satisfied as long as "the class claims arise out of the same legal or remedial theory," *Johns*, 145 F.R.D. at 483. It is enough to satisfy commonality that there be a "common question ... at the heart of the case...." *Rosario*, 963 F.2d at 1018.

Plaintiffs contend that the following common questions of law and fact are present: whether Defendants engaged in a conspiracy; whether Defendants violated the antitrust laws; whether Defendants took steps actively to conceal the conspiracy; and whether Defendants' conduct caused injury to the business or property of Plaintiffs and the members of the class and, if so, the appropriate classwide measure of damages. Plaintiffs' Memo. at 9–10. Courts in the Seventh Circuit hold that "the question of the existence of a conspiracy in restraint of trade is one that is common to all potential plaintiffs, and the importance of this question usually warrants treating them as a class." *Sebo v. Rubenstein*, 188 F.R.D. 310, 313 (N.D.Ill. 1999) (citation omitted); *see also Service Spring, Inc. v. Cambria Spring Co.*, 1984 WL 2925, at *2 (N.D.Ill. Jan. 6, 1984) ("Without doubt, both the existence of conspiracy and whether defendants fraudulently concealed the alleged conspiracy are common issues."); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 WL 663590, at *2 (N.D.Ill. Nov. 18, 1994) ("Specifically, the

---

7. Another factor further demonstrates the inappropriateness of more than a *preliminary* examination of the merits at this time. In one of the expert affidavits flying back and forth with the class certification briefs, Dr. Wecker reaches one conclusion on the basis of pricing data before him. 2nd Wecker Aff., ¶¶ 5–7. In another affida-

vit, Dr. Kagel notes that certain information available to Dr. Wecker has not been made available to him. 2nd Kagel Aff., ¶ 46 n. 43. Indeed, motions to compel discovery litter the docket, *e.g.*, # 80, 148, 152, 171. Considering the disputes over data, it would be unfair to decide the merits at this time.

existence and scope of the alleged conspiracy among the defendants to unlawfully raise, fix and maintain prices of brand name prescription drugs at supra-competitive levels are questions common to all class members."). Even if some questions of law and fact will be unique to certain class members, there are many common questions of law and fact. For this reason, the Court must find that Plaintiffs satisfy the commonality requirement of Rule 23(a)(2).

### 3. Typicality

■ Rule 23(a) further requires that "the claims . . . of the representative parties are typical of the claims . . . of the class." Fed. R.Civ.P. 23(a)(3). This requirement is satisfied where the named plaintiffs' claims "arise[ ] from the same . . . practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir.1983) (citation omitted). "The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through pursuit of their own goals." *In re Prudential Ins. Co. of Amer. Sales Practices Litig.*, 148 F.3d 283, 311 (3d Cir.1998). For this reason, "the representatives' claims need not be identical to the class members'; rather, it is sufficient if they are substantially similar." *Ruiz v. Stewart Associates, Inc.*, 171 F.R.D. 238, 242 (N.D.Ill.1997) (citation omitted). Here, Plaintiffs argue that typicality is satis-

fied because AFR and General Foam share certain characteristics with all class members: (1) the same legal claim for violations of Section 1 of the Sherman Act; (2) the same factual allegations that Defendants formed a conspiracy; and (3) injury caused by the same wrongful conduct of Defendants. Plaintiffs' Memo. at 11.

■ Great Lakes claims that AFR and General Foam are not even similar to each other, let alone typical of Defendants' customers, and makes two related arguments on this basis. First, Defendant Great Lakes argues that American Fire Retardant and General Foam are not typical of potential class members due to the limited nature of their purchases. It certainly is true that AFR and General Foam are not Great Lakes's best customers.[8] As Great Lakes points out, while AFR made a one-time purchase of decabrom in the amount of $4,632 in 1995, its main customers purchased millions of dollars worth of decabrom in any give year during the class period.[9] Opp. to Class Cert. at 13. Similarly, General Foam made limited purchases of DE–60F, a pentabrom blend, during the class period; whereas, another customer, Akzo, was responsible for approximately 90% of Great Lakes's pentabrom sales.[10] Opp. to Class Cert. at 20. However, this argument is unavailing. We agree with the conclusion set forth in *Service Spring*, 1984 WL 2925, at *3, where the court rejected the defendants' argument that the named plaintiff's participation in the market was too small and specialized to be typical of the

---

8. Of course, it is insignificant that neither of the named plaintiffs purchased brominated products from the Dead Sea Defendants. As the Third Circuit plainly stated in *Bogosian v. Gulf Oil Corp.*, the "fact that a customer has not made purchases from every co-conspirator does not prevent him from suing all—for each co-conspirator contributed to the charging of the supra-competitive price paid by the purchaser." 561 F.2d 434, 448 (3d Cir.1977).

9. For instance, in 1997, Huntsman, B.F. Goodrich, and Union Carbide purchased $22,125,000, $4,078,000, and $925,000 worth of decabrom, respectively. James Aff., Tab 6, App. to Opp.

10. Great Lakes questions whether Plaintiffs intended to include purchasers of this product in the class definition, Great Lakes's Opp. at 7, but

it seems clear that the definition includes them since the class definition refers to those who purchased "pentabromodiphenyl oxide and [its] blends." Great Lakes concedes that DE–60F is a pentabrom blend.

Great Lakes also objects to including purchasers of DE–60F in the class on the grounds that Great Lakes, alone of all alleged co-conspirators, was the only supplier of pentabrom and octabrom in the United States during the class period. A memorandum from Bouchard at Great Lakes to Dead Sea shows that Ameribrom shut down its pentrabrom facility and ceased selling pentabrom products in the U.S. at the beginning of the conspiracy period. Tab 24, Appendix to Plaintiffs' Reply. On this basis, Plaintiffs argue that Great Lakes's status as sole seller of pentrabrom was the result of the very conspiracy they challenge.

**410**

claims of potential class members. *Service Spring* properly applied the reasoning of *De La Fuente* to the antitrust situation. In *De La Fuente*, 713 F.2d at 232, the Seventh Circuit refused to accept the argument that named plaintiffs were not typical because their employment by the allegedly offending farm labor contractor was shorter than that of some class members. The court reasoned that illegal recruitment and disclosure practices would give rise to the same claim for all workers, even workers employed for a short time. *Id.* Likewise, here any illegal price-fixing possibly engaged in by Defendants creates the same claim for all purchasers, large or small. In short, "similarity of legal theory may control even in the face of differences of fact." *Id.* (citation omitted).

Second, Great Lakes contends that the manner of purchase by American Fire Retardant and General Foam is so different from that of other class members as to render their claims atypical. Indeed, customers purchased brominated products in a variety of ways. General Electric Plastics purchased tetrabrom through "tolling"; for each pound of tetrabrom that it wanted, GE shipped Great Lakes .45 pounds of bisphenol, a key tetrabrom ingredient, and paid a fee, or toll, for conversion of the ingredient into tetrabrom. Other purchasers negotiated yearly contracts for large amounts of a particular product. In contrast, for instance, AFR made a one-time purchase, after minimal negotiation, for a limited amount of decabrom. Great Lakes' argument has been made and rejected before. As succinctly put in *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 690–91 (D.Minn.1995), "Rule 23(a)(3) does not require that all members of a proposed class pay the same amount or use similar purchase methods in order to pursue an antitrust price-fixing claim." If the typicality criterion did so require, few antitrust class actions could ever be certified because price-fixers would manipulate minor variations in price and manner of sale in order to avoid liability. The claims of Plaintiffs remain "substantially similar" even though purchasers used different purchasing methods. Hence, typicality is satisfied.

### 4. Adequacy of Representation

■ The named representatives must "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The adequacy standard involves two elements: one relates to the adequacy of the named plaintiffs' representation of the class and requires that there be no conflict between the interests of the representative and those of the class in general; the other relates to the adequacy of class counsel's representation. *Susman v. Lincoln American Corp.*, 561 F.2d 86, 90 (7th Cir.1977). Great Lakes does not challenge the adequacy of the proposed class counsel's representation of the class, and the Court notes that the various law firms proposed for this position have been found able advocates in many other class action lawsuits. Blanchfield Aff., Ex. A. For this reason, our analysis focuses on the first of the two factors.

Great Lakes argues that AFR and General Foam cannot represent the class adequately for two reasons. First, Great Lakes claims that named plaintiffs are inadequate "class representatives because they have relied entirely upon their lawyers to direct this lawsuit." Opp. to Class Cert. at 28. In support of this contention, Great Lakes cites the deposition testimony of principals of the named plaintiff businesses. For instance, Anthony A. DiStasio of General Foam testified that he had no input "whatsoever" into the complaint. DiStasio Depo. at 62–63. Stephen F. Owens, president of American Fire Retardant, testified that "basically [he] relied on [his] attorneys' fact finding and information" in his complaint that Defendants engaged in price fixing. Owens Depo. at 53–54. While the involvement of class representatives may not be particularly impressive, they cannot be found inadequate on this basis. In *Paper Systems Inc. v. Mitsubishi Corp.*, the court rejected the same argument, noting that plaintiffs' "conceding a lack of personal knowledge of defendants' antitrust violations appears to bespeak his credibility; it is rare for a victim to be at the table when antitrust conspiracies are hatched and agreed upon...." 193 F.R.D. 601, 609–10 (E.D.Wis. 2000).

Here, the named plaintiffs reviewed the complaint, responded to document requests, and appeared for depositions. Owens Depo. at 50–52; DiStasio Depo. at 24, 34. At the hearing, Mark Reinhardt, Class Plaintiffs' Lead Counsel, represented to the Court that counsel works with the president of AFR and the general counsel of General Foam in order to gain approval of litigation decisions. Active involvement in the case, such as the participation demonstrated by American Fire Retardant and General Foam, helps demonstrate adequate representation. *In re Playmobil Antitrust Litig.*, 35 F.Supp.2d 231, 243 (E.D.N.Y.1998). More than that may be desirable, but is not required. As the court in *Paper Systems*, 193 F.R.D. at 609, noted, "there is no requirement that the representative plaintiff be knowledgeable of either the allegations or the legal theories on which the law rests." *See also Kaplan v. Pomerantz*, 131 F.R.D. 118, 122 (N.D.Ill.1990) ("As long as the plaintiff has some basic knowledge of the lawsuit and is capable of making intelligent decisions based upon his lawyers' advice, there is no reason that he may not delegate further factual and legal investigation to his attorneys.").

■ Great Lakes further contends that "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Opp. to Class Cert. at 29 (citing *Amchem Products v. Windsor*, 521 U.S. 591, 625–26, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). Defendant makes a number of arguments to support the general contention that AFR and General Foam do not meet the standard set forth in *Amchem*. All, however, are un-

persuasive. The crux of Defendant's argument is that the named plaintiffs would be inadequate representatives because "they did not purchase four of the five products identified in their amended class definition." Opp. to Class Cert at 29.[11] Certainly, one must have purchased a product covered by the conspiracy to have standing. *In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 609 (N.D.Ga.1997). However, as decided above in the discussion concerning numerosity, at this stage of the proceedings, it is not necessary to create separate classes for purchasers of the various types of brominated products.[12] Plaintiffs offer evidence that the alleged conspiracy relates to all brominated products, as defined in the class definition. Furthermore, Plaintiffs' expert testimony suggests that brominated products are a commodity, meaning that the prices of all of the products are related. On this basis, it appears that there is no conflict between AFR and General Foam, as purchasers of decabrom and pentabrom products, and the potential class members who purchased these and other bromine products, including the agricultural fumigant methyl bromide.

Great Lakes also argues that AFR and General Foam are not adequate class representatives because they are not major purchasers of brominated products. Opp. to Class Cert at 29 n. 9 ("Nor are plaintiffs adequate class representatives of purchases of the remaining product—decabrom—because American Fire purchased decabrom only 'one time' in 1995, and then never again."). A similar argument was also made by Great Lakes with respect to typicality,

---

11. This characterization of the purchases of AFR and General Foam in relation to the class definition overstates Great Lakes's case. As Great Lakes admits, AFR purchased decabrom in August 1995. Also, as noted above, DE–60F, a pentabrom blend purchased by General Foam, is part of the class definition, meaning that the proposed representatives purchased two of the five products at issue.

12. Many cases have noted that the same arguments against class certification are relevant to any number of the specific requirements under Rule 23(a) and (b). *E.g., In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524, 529 (M.D.Fla.1996) (examining arguments with re-

spect to both commonality and predominance); *Service Spring*, 1984 WL 2925, at *3 (noting the fine distinctions between typicality, commonality, and adequacy of representation); *In re Commercial Tissue Products*, 183 F.R.D. 589, 592 (N.D.Fla.1998) (noting that defendants attack predominance and typicality with same arguments). At the hearing, Great Lakes argued many of its points with regard to more than one requirement of Rule 23. We address Defendant's arguments under the headings to which they are most applicable. When important points can be made concerning the same argument as it applies to different sections of Rule 23, we discuss them briefly in all relevant sections.

but it is worth addressing briefly as it relates to adequacy of representation. In short, it is of no consequence that American Fire Retardant's purchase occurred only at the beginning of the class period. *Paper Systems,* 193 F.R.D. at 610 ("[A]n antitrust class representative need only be fairly covered by the class definition; there is no requirement that it have purchased from defendants throughout the entire class period."). We also note that General Foam purchased DE–60F at various times during the class period. DiStasio Dep. at 42. In an effort to salvage its argument, Great Lakes points to *Burkhalter Travel Agency v. MacFarms Int'l, Inc.,* in which the court opined that "[i]t is absurd to think that a better plaintiff than a travel agency in Wisconsin cannot be found to pursue a class action on behalf of all persons who directly purchased macadamia nuts in the United States over a five-year period." 141 F.R.D. 144, 150 (N.D.Cal.1991). *Burkhalter* is distinguishable. Specifically, the court's argument pertained to one factor in an analysis of standing—the existence of other more appropriate plaintiffs. *Id.* Here, Great Lakes does not challenge standing, probably because General Foam's purchases over much of the class period defeat that argument. In addition, the court in *Burkhalter* emphasized the fact that another company, who purchased the macadamia nuts from Burkhalter through a cost-plus contract actually suffered an injury resulting from price-fixing, rather than Burkhalter. *Id.* No allegations of similar arrangements are made in this case. Great Lakes's argument based on the limited nature of named plaintiffs' purchases cannot defeat adequacy of representation, just as it was unsuccessful in defeating typicality.

## B. Requirements of Rule 23(b)(3)

Having found that the class certification requirements of Rule 23(a) are met, we now examine whether the criteria set forth in Rule 23(b) have been satisfied. Plaintiffs assert suitability for class certification under Rule 23(b)(3), which requires that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

### 1. Predominance of Common Issues

Common questions predominate when they "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure: Civil* § 1778. *See City of Boerne v. Flores,* 521 U.S. at 515–16, 117 S.Ct. 2157, 138 L.Ed.2d 624. Here, "Plaintiffs must establish that the common questions of law or fact predominate with respect to the elements of their antitrust violation claims." *Panache Broadcasting of Pennsylvania, Inc. v. Richardson Electronics, Ltd.,* 1999 WL 342392, at *5 (N.D.Ill. May 14, 1999). The elements include (1) violation of antitrust laws; (2) harmful impact or injury to Plaintiffs' business or property; and (3) damages. *In re Industrial Gas Antitrust Litig.,* 100 F.R.D. 280, 287 (N.D.Ill.1983) (citation omitted).

Before addressing these elements individually, we pause to examine the overarching theme of Great Lakes's argument advanced at the hearing. There, Great Lakes argued that, should this proceeding be permitted to continue as a class action, Great Lakes would be deprived of the opportunity to present its individualized "very rich stories" to the jury. Great Lakes, pointing to the deposition testimony of some of its customers, contends that they will testify that there was no conspiracy during the relevant time period as evidenced by the fact that price competition between the alleged co-conspirators allegedly was "bitterly" competitive. Opp. to Class Cert at 14–16. For instance, Russell Gann, Director of Procurement for Southwest Chemicals, a division of M.A. Hanna, testified that the decabrom market was "very competitive." Gann Depo. at 53. Likewise, Al Emmens negotiated decabrom purchases for his employer, Union Carbide. He testified that, during the class period, "we [were] hearing from all three of the suppliers better and better offers which

is wonderful for us." Emmens Depo. at 37–38. Great Lakes's concern is that, at trial, if a class is certified, Plaintiffs would object to the testimony from any class members other than AFR and General Foam, thereby precluding the jury from hearing that at least some of its customers felt they did not experience any antitrust violation. Opp. to Class Cert. at 33–34. Alternatively, Great Lakes argues that if Plaintiffs promise not to make such objections, thereby permitting such testimony from non-named plaintiffs, then the trial would not be litigated as a class action.

This argument is interesting (whetting our appetite for Defendant's "rich stories"), but it is ultimately unconvincing. Citing *In re Fibreboard Corp.*, 893 F.2d 706 (5th Cir.1990), Great Lakes argues that testimony from named plaintiffs and from class members like Union Carbide and M.A. Hanna would make this case something other than a class action; something not permitted by Rule 23. The district court in *In re Fibreboard* certainly did establish a creative procedure for dealing with thousands of asbestos cases. The *Fibreboard* district court arranged a system (for lack of a better word) in which Phase II of the trial would consist of a full trial of liability and damages for 41 plaintiffs determined to be "representative" of the issues presented. *Id.* at 707. For instance, different plaintiffs suffered different diseases, were exposed for different periods of time, and worked in different occupations. *Id.* at 710. The Fifth Circuit rejected this innovation on the simple grounds that these differences demonstrated that common questions of law or fact did not predominate over the claims of individual litigants. *Id.* at 712.

The situation before us is of a different nature than that troubling the appellate court in *Fibreboard*. Here, key issues in the case concern whether there was a conspiracy and whether plaintiffs suffered an impact as a result of the conspiracy. That some class members may perceive that the co-conspirators did not engage in price-fixing is simply the other side of the same coin.[13] Their

testimony focuses on the same predominant issues—violation of antitrust laws and impact. It also is the same type of evidence—customer testimony—that named plaintiffs may offer. In short, the individualized "rich stories" of certain customers do not defeat predominance. One typical defense to the charge of "You fixed prices" is "No, we did not." Class certification will not prevent Defendant from offering evidence to that effect at trial.

### a. Violation of Antitrust Laws

With respect to the first element, Plaintiffs allege a single conspiracy involving the illegal fixing of prices of various products containing bromine. "The weight of authority in antitrust cases indicates that the existence of a conspiracy in restraint of trade is one that is common to all potential plaintiffs." *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 336 (N.D.Ill.1997). Great Lakes attacks this authority by arguing that the guilty plea entered into by Dead Sea in the related criminal case does not provide the factual basis necessary to support Plaintiffs' allegation of conspiracy. As noted many times in this opinion, *Szabo* requires us to "make a preliminary inquiry into the merits" of Plaintiffs' allegations. 249 F.3d at 676. Hence, we now address Defendant's arguments concerning the insufficiency of the guilty plea to support the conspiracy charged in the complaint.

On July 27, 2000, following investigation by the Department of Justice, Dead Sea entered into a plea agreement. Plea Agreement, Tab 2, Appendix to Plaintiffs' Reply. Dead Sea pled guilty to a one-count Information charging that Dead Sea and its "co-conspirators entered into and participated in a combination and conspiracy to suppress and eliminate competition by allocating customers and fixing the price for TBBA [tetrabrom], DECA [decabrom] and 100% methyl bromide." Information, Tab 3, Appendix to Plaintiffs' Reply. Great Lakes claims that Dead Sea's

---

**13.** We also note that few customers would be privy to the knowledge that their suppliers were conspiring against them. *Paper Systems*, 193 F.R.D. at 609–10. By its very nature, a conspiracy to price fix is secret. *Id.* Furthermore, as

noted earlier, dropping prices may simply indicate that the conspiracy's goal simply is to keep prices from dropping even lower. *In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374, 378 (S.D.N.Y.1996).

guilty plea cannot serve as the substance behind the complaint sufficient to warrant class certification under Rule 23(b)(3). Great Lakes points out that, in many aspects, the guilty plea outlines a conspiracy narrower in scope and duration than the conspiracy alleged in this civil case. Opp. to Class Cert. at 10. It is true that the guilty plea refers to a conspiracy encompassing three product groups (DECA, TBBA, and 100% methyl bromide), rather than the wider array of products included in the civil conspiracy charges. Information ¶ 3(b)(i)-(iii). In addition, the criminal indictment covers a shorter time span than the proposed class period. *Id.* (DECA sold from October, 1997 until April, 1998; TBBA sold from July, 1995 until April, 1998; and 100% methyl bromide sold from July, 1997 until April, 1998).

However, these differences between the guilty plea and the complaint do not warrant a finding that common issues of fact and law will not predominate with regard to proving the violation of antitrust laws. First, the Court notes that classes can be certified in cases in which there has been no indictment. *See, e.g., Brand Name Prescription Drugs,* 1994 WL 663590, at *1. With regard to the more limited range of products included in the criminal conspiracy charge, Defendant far overstates its argument when it claims that "the *only fact* that plaintiffs offer in support of their amended class definition is Dead Sea Bromine's guilty plea in July 2000." Opp. to Class Cert. at 10 (emphasis in original). Rather, as discussed in the above section on numerosity, some communications between the two companies refer to "[l]ong-term cooperation in various business pursuits" in relation to products not listed in the guilty plea. *See, e.g.,* Tabs 16–17, Appendix to Plaintiffs' Reply. The argument that the shorter time period set forth in the guilty plea cannot support the more than three year class period similarly is without merit. In *In re Residential Doors Antitrust Litig.,* 1998 WL 151804, at *1–2 (E.D.Pa. Apr. 2, 1998), the court approved a class who purchased residential doors from June 1, 1990 to December 31, 1994, even though the criminal guilty pleas in the case covered only the period from January 1, 1993 to December 31, 1993. While Plaintiffs ultimately may not be able to prove that the conspiracy covered as extensive a period as they initially claim, Defendant's argument does not indicate that Plaintiffs will not be arguing common issues of law and fact to make their case, which is all that is required at this stage of the proceedings.

### b. Impact

■ With regard to harmful impact or injury, Plaintiffs allege that Defendants' conspiracy to raise the price of brominated products above competitive levels had a common impact upon all members of the class. Complaint, ¶¶ 30–34, 36. Great Lakes presents four arguments supporting the proposition that Plaintiffs cannot use common evidence to demonstrate class wide impact: (1) product and market diversity; (2) substantial buyer power; (3) diversity in the manner of purchase; and (4) variation in prices. Opp. to Class Cert. at 31.

Great Lakes argues that the varying prices and the diverse supply and demand factors affecting five different bromine compounds and their derivatives and blends preclude generalized proof of impact on a class of plaintiffs. Opp. to Class Cert. at 31–32. Bromine can indeed be made into many compounds serving many different purposes, from flame retardant back-coating for curtains to insecticides. *Id.* at 14, 18. This argument fails, however. As discussed in the section on numerosity, a battle of the experts at this stage of the proceedings is inappropriate. Dr. Kagel testifies that common methods can be used to show impact throughout the class. Case law agrees. A wide range of products and prices does not make it impossible to use common proof to demonstrate impact. *See Industrial Diamonds,* 167 F.R.D. at 383 (certifying modified class even though more than 8000 industrial diamond products were for sale during proposed class period and several product "families" were in wide range of industrial diamond products).

Great Lakes's arguments that substantial buyer power and variation in prices preclude finding that common issues predominate is a red herring. Great Lakes cites affidavits and deposition testimony from a number of

its customers indicating that some of them unilaterally canceled contracts and engaged in other practices leading to decreasing, flat, or even increasing prices for various bromine products. Opp. to Class Cert. at 31 (citing e.g., Teat Aff., ¶¶ 5–23, Gann Depo. at 53). For a number of reasons, that prices were not rising uniformly is not a reason to refuse to certify a class. First, price-fixing in an effort to halt a decline is as much an antitrust violation as conspiring to raise otherwise unstable prices. See Industrial Diamonds, 167 F.R.D. at 378. Second, unstable prices could indicate, as Great Lakes argues, that impact is not a classwide issue, or they could indicate that the co-conspirators simply were not very good at conspiring to stabilize prices. Most importantly, since the question is whether common issues predominate, "[p]rice fixing conspiracies, at least to the extent they succeed in fixing prices, almost invariably injure everyone who purchases the relevant goods or services." In re Auction Houses Antitrust Litig., 193 F.R.D. 162, 166 (S.D.N.Y.2000). Paying unstable prices that are higher than they would have been absent a conspiracy constitutes an antitrust injury.

Finally, Great Lakes maintains that the question of impact renders class certification inappropriate because the diverse manner of purchase among customers would devolve any class trial into a series of individual minitrials. Opp. to Class Cert. at 31. As explained in the section covering typicality, Great Lakes presents evidence of purchases involving tolling agreements, negotiated contracts involving unrelated commercial transactions, and annual distributor contracts. Id. (citing e.g., James Aff. ¶¶ 42–46; Teat Aff. ¶¶ 5–23). Despite "individual price negotiations, plaintiffs may succeed in showing classwide impact by showing that the minimum baseline for beginning negotiations, or the range of prices which resulted from negotiation, was artificially raised (or slowed in its descent) by the collusive actions of the defendants." Commercial Tissue Products, 183 F.R.D. at 595. In Industrial Diamonds, 167 F.R.D. at 383, the court concluded that price lists set such a baseline for showing common impact. Here, Great Lakes produced price lists. 1st Kagel Aff., ¶ 17. In addition, Dr. Kagel concludes that despite price differ-

ences, often the result of volume discounts, impact can still be calculated on a formulaic basis for all class members. Id., ¶ 18. As noted before, Great Lakes's criticisms of Dr. Kagel's testimony do not warrant dismissing his findings at this time.

The final issue with regard to predominance is whether the question of damages is subject to common proof. Great Lakes does not seriously challenge this issue, and the case law makes clear that such a challenge would not succeed. Rohlfing, 172 F.R.D. at 337 ("If it is feasible to prove that the plaintiff class as a whole has been injured by the defendants' conspiracy, then the class may be certified even though individual damage questions remain to be resolved at a later stage of the proceedings."); Arenson v. Whitehall Convalescent and Nursing Home, Inc., 164 F.R.D. 659, 666 (N.D.Ill.1996) ("It is well established, however, [that] the presence of individualized damages does not render the class unsuitable for certification."). Indeed as the Seventh Circuit has said, "[i]t is very common for Rule 23(b)(3) class actions to involve differing damage awards for different class members." De La Fuente, 713 F.2d at 233.

## 2. Superiority

 The final question under Rule 23 involves superiority. Rule 23(b)(3) requires, in order for a class to be certified, "that a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). To determine whether a class action is superior to trying cases separately courts look to four factors, including: (1) the interest of class members in individually controlling the litigation; (2) the extent to which litigation already has been commenced by other members of the class; (3) the desirability of concentrating the litigation in a particular forum; and (4) the management difficulties likely to be encountered. Id. These factors are satisfied here. Great Lakes has offered no argument that the class members are interested in controlling litigation separately, and no other class members have filed related suits. As Defendant itself noted, some of the purchasers are rather small cus-

tomers. Their minor stakes make the case especially suitable for class proceedings. *Alexander v. Q.T.S. Corp.*, 1999 WL 573358, at *13 (N.D.Ill. July 30, 1999) ("In light of the great costs of discovery and trial, class certification is particularly important where many small and medium sized claimants are involved who would not otherwise be able to secure relief."). While there will undoubtedly be some individual matters to resolve which will complicate manageability, the Court has found that common issues predominate. Proceeding with a class action, rather than with numerous individual trials, will less tax precious judicial resources. *See In re Brand Name Prescription Drugs*, 1994 WL 663590, at *6.

## III. Preliminary Approval of Proposed Partial Settlement

The purpose of a preliminary hearing, like the one held on September 6, is to prepare the way for a fairness hearing so that the parties may receive court approval of their settlement as required by Federal Rule of Civil Procedure 23(e). At the fairness hearing, the settlement is examined to ensure that it is "fair, reasonable, and adequate." *Agretti*, 982 F.2d at 242. All that is required at the preliminary hearing in order to progress to the fairness hearing is that the proposed settlement be "within the range of possible approval." *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1124 (7th Cir.1979). This bar is low, and the Settlement Agreement between Plaintiffs and the Dead Sea Defendants manages to hurdle it.

Both the substance and also the procedure of the settlement require investigation before preliminary approval can be granted. The Manual for Complex Litigation warns courts to be on the lookout for "obvious deficiencies, such as unduly preferential treatment of class representatives or of segments of the class, or excessive compensation for attorneys." Annotated Manual of Complex Litigation § 30.41 (3d ed.2001). This Settlement Agreement is admittedly quite vague, which raises some concerns. For instance, while the agreement provides that Dead Sea or Ameribrom will pay $2,525,000, it says little

about what will be done with money. Settlement Agreement, ¶¶ D.1–4. In fact, one provision states that "[a]fter this Agreement becomes Finally Approved, the Settlement Fund shall be used and/or distributed in accordance with the Plan that Class Counsel shall submit at the appropriate time for approval by the Court." *Id.* at ¶ D.3. At the hearing, Plaintiffs and Dead Sea Defendants addressed our questions, including concerns that all of the fund would be used to pay attorney fees or that the class representatives would receive a disproportionate share of the settlement. With regard to the first concern, we were informed that it is quite possible that a large amount of the fund will in fact be used for litigation costs. However, members of the class against the Dead Sea Defendants are the same as members of the class against Great Lakes. The settlement with the Dead Sea Defendants provides Plaintiffs with funding to pursue their perhaps more lucrative claims against Great Lakes, which is not an impermissible use of the settlement fund. Furthermore, as noted in Paragraph D.4 of the Settlement Agreement, use of the fund to cover litigation costs must be approved by the Court. We are certain that the need for our approval will help keep spending in check. As to the latter concern, Mr. Reinhardt, on behalf of Plaintiffs, represented to the Court that the fund, along with any recovery against Great Lakes, would be distributed pro rata based on each plaintiffs' amount of purchases. This arrangement alleviates our concern that AFR and General Foam would receive a disproportionate amount of the settlement fund. Finally, case law, implementing the suggestion of an earlier version of the Manual for Complex Litigation, requires courts to examine the identity of the negotiating parties in order to guard against unfair procedure to reach a settlement. *In re General Motors Corp.*, 594 F.2d at 1125. At the hearing, Christine Levin, attorney for the Dead Sea Defendants, made clear that negotiations were hard fought, extending over an eight month period, with little danger of collusion. Based on these representations, we are satisfied that the settlement merits our preliminary approval.

## IV. Conclusion

For the reasons set forth above, Plaintiffs' Amended Motion for Class Certification is *GRANTED.* The class, as defined in the motion, is hereby *CERTIFIED.*

FURTHER, preliminary approval of the proposed partial settlement is *GRANTED.*

FURTHER, it is ordered that the Dead Sea Defendants and Plaintiffs submit for approval the proposed notice of the partial settlement by October 9, 2001 and tender therewith their proposed schedule for processing possible objections to the settlement and for scheduling a fairness hearing.